**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-0235-WJM-STV

ANDERSEN MANUFACTURING INC.,
an Idaho corporation,

      Plaintiff,

v.

WYERS PRODUCTS GROUP, INC.,
a Colorado corporation,

      Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DENYING AS MOOT PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY,
AND TERMINATING CASE**

---

      Plaintiff Andersen Manufacturing, Inc. ("Andersen"), sues Defendant Wyers Products Group, Inc. ("Wyers"), for patent infringement. The inventions at issue are an adjustable-height trailer hitch made from aluminum and the process for manufacturing that hitch.

      This case began in January 2016 in the United States District Court for the District of Idaho, the Hon. B. Lynn Winmill presiding. The case was transferred to this Court in January 2018. In the midst of all these proceedings, the patents-in-suit have been subject to reexamination proceedings in the Patent and Trademark Office. An August 2016 decision from that office invalidated all claims of the patents-in-suit (*see* ECF No. 96-17), but that decision remains non-final and so does not govern here. In December 2016, Judge Winmill denied Wyers's motion to stay the lawsuit pending the

conclusion of reexamination proceedings. (ECF No. 55.) Wyers renewed that motion in April 2017 but Judge Winmill did not rule on it before transfer to this District. Shortly after transfer, U.S. Magistrate Judge Scott T. Varholak denied the renewed motion without prejudice, essentially reasoning that it was outdated in light of the lapse of time since its filing and the subsequent transfer. (ECF No. 90.) Wyers never filed a new motion to stay, and this case is set for trial in April 2019. (ECF No. 111.)

Before the Court is Wyers's Motion for Summary Judgment (ECF No. 96) and Andersen's Motion for Leave to File Sur-Reply in Opposition to Motion for Summary Judgment ("Surreply Motion," ECF No. 103). For the reasons explained below, the Court grants Wyers's Motion for Summary Judgment and denies the Surreply Motion as moot. This result also moots Andersen's Motion to Exclude Testimony of Dan Alan Beabout (ECF No. 112), which was recently filed and is not yet fully briefed.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND

The following is undisputed unless attributed to a party or otherwise noted.

A.      **The 412 Patent**

U.S. Patent No. 7,156,412 ("412 Patent") issued to Andersen on January 2, 2007, from an application filed on June 20, 2005, which was itself a continuation of an application filed on November 27, 2002. *See* 412 Patent, cover sheet. The field of the invention is towing hitches, such as for towing a boat or RV behind a truck. *Id.* at 1:14– 62. As relevant here, the patent discloses a "stepped," or adjustable, hitch assembly, which permits the user to attach trailers of varying heights while keeping the trailer level. In the following illustrations from the patent, Figure 5 depicts the "drop bar" component whose upper (horizontal) segment slides into the towing vehicle's hitch adapter, and whose other (vertical) segment is a series of graded steps over which the "sleeve" in Figure 6 can slide, locking into various heights. The hollow column disclosed in Figure 6 secures the ball mount—the item that actually makes contact with the trailer— illustrated in Figure 7.



Fig. 5

Fig. 6

Fig. 7

As will become clear below, the 412 Patent was not the first to propose this basic design. The patentable innovation asserted in the 412 Patent is that the components are made of aluminum, rather than steel. *Id.* at 1:42–2:4.

**B.    The 510 Patent**

U.S. Patent No. 7,222,510 ("510 Patent") issued to Andersen on May 29, 2007, from an application filed on February 21, 2006, which was itself a continuation of applications tracing back to the same November 27, 2002 application from which the 412 Patent arose. *See* 510 Patent, cover sheet. The 412 and 510 Patents share the same specification, but in terms of the claimed invention, the 510 Patent emphasizes the method for creating aluminum drop bars, as compared to the 412 Patent's emphasis on the hardware itself.

The illustrations relevant to the 510 Patent focus on a *non*-adjustable drop bar, *i.e.*, one that emerges horizontally from the vehicle's hitch adapter, then slopes downward, then bends again into a lower horizontal component, to which the ball

adapter is attached, as in the following:



Fig. 4

With this end product in mind, the patent illustrates how aluminum may be extruded through a die to form a thick metal sheet with the appropriate drop bar profile (Figure 1), after which the sheet can be sliced into multiple proto-drop bars that are machined into their final form (Figure 2):



Fig. 1                     Fig. 2

Although these illustrations only show the vaguely S-shaped, non-adjustable drop bar, the 510 Patent does not limit itself to manufacturing that shape. It also applies

to extrusion of aluminum drop bars in the upside-down-L shape of the drop bar emphasized in the 412 Patent.  *See* 510 Patent, fig. 5; *id.* at 6:12–17.

## C.     Wyers's "Razor" Adjustable Hitch

Since 2012, Wyers has offered for sale its "Razor" adjustable hitch, which is made of aluminum and is remarkably similar to the device disclosed in the 412 Patent:



(ECF No. 96-32 at 2.)[1]  As this photograph shows, the only apparent differences between the Razor and the invention disclosed in the 412 Patent is that the graded steps face toward the towing vehicle, and the surface facing away from the towing vehicle is rounded.

Wyers does not deny that it manufactures its Razor hitches through a process that includes extruding aluminum through a die.  Whether that extrusion results in something covered by the 510 Patent is disputed, and addressed below in Part IV.B.

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination.

### III.  PRELIMINARY MATTERS

To support some of its factual contentions, Andersen attaches a declaration from its expert, Scott Meek.  (ECF No. 101-2.)  In the middle of its reply brief, Wyers moves to exclude Mr. Meeks's declaration under Federal Rule of Evidence 702.  (ECF No. 102 at 7–9.)  Then, later in its reply brief, Wyers attaches a declaration from its own expert, Dan Beabout, supposedly to rebut some of Andersen's claims.  (ECF No. 102-5.)  Mr. Beabout's declaration contains attachments (regarding use of aluminum in heavy-load situations) that Andersen claims were not disclosed during discovery but should have been.  Wyers's reply brief also attaches a 1916 patent that Wyers should have produced during discovery.  (ECF No. 102-4.)  These arguments and evidence, among other things, prompted Andersen's Surreply Motion.  (ECF No. 105.)

Wyers's mid-brief motion to exclude Mr. Meeks's declaration directly violates D.C.COLO.LCivR 7.1(d)'s admonition that "[a] motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document."  It also contradicts the undersigned's more explicit instructions in his Revised Practice Standard III.B, which reads in relevant part:

> All requests for the Court to take any action, make any type of ruling, or provide any type of relief must be contained in a **separate**, written motion.  A request of this nature contained within a brief, notice, status report or other written filing does not fulfill this Practice Standard. . . .  This requirement does *not* apply to objections to summary judgment evidence unless the objecting party is seeking total or partial exclusion of expert testimony under Federal Rule of Evidence 702.

(Emphasis in original; cross-reference omitted.)  This Practice Standard explicitly states that a Rule 702 motion is not an exception to the general requirement of filing a

separate motion.[2]  The Court therefore *sua sponte* strikes that portion of Wyers's reply brief challenging Mr. Meeks's declaration.

As to Mr. Beabout's declaration, his exhibits, and the new patent attached the reply brief, the Court has not relied on them in its analysis below, and therefore need not strike them nor grant Andersen a surreply.  Andersen's remaining arguments, which seek to rebut claims that it misrepresented the record, are irrelevant.  In this light, Andersen's Surreply Motion is denied as moot.

## IV.  ANALYSIS

### A.    The 412 Patent, Claims 21 & 22

Concerning the 412 Patent, Andersen does not dispute Wyers's assertion that this lawsuit has now been narrowed to claims 21 and 22 of that patent.  (ECF No. 96 at 8–9.)  Those claims read as follows:

> **21.** A stepped drop bar insertion into a hitch adapter of a motorized vehicle, the stepped drop bar comprising:
>
> a first component of the stepped drop bar having an end comprising solid aluminum, wherein the end is configured with outside dimensions which permit insertion of the end into the hitch adapter of a motorized vehicle for towing; and
>
> a second component of the stepped drop bar that is selectively coupled to the first component to provide a vertical adjustment of the stepped drop bar.
>
> **22.** A stepped drop bar as recited in claim 21, wherein the end is a standard two inch square end.

Obviously, of these two claims, only 21 is independent.  And Andersen does not dispute

---

[2] Wyers's counsel has a habit of disregarding practice standards.  Wyers's Motion for Summary Judgment (ECF No. 96) and reply brief (ECF No. 102) entirely ignore the undersigned's practice standards regarding such motions and replies.  *See* WJM Revised Practice Standards III.E.3 & 6.  Should this lawsuit ever return to the undersigned, the Court expects better in any future submissions.

Wyers's assertion that the only portion of claim 21 that potentially distinguishes it from the prior art is the requirement of a "stepped drop bar having an end comprising solid aluminum." (*See* ECF No. 96 at 8.)

Wyers argues that claim 21 is invalid because it was anticipated. "Anticipation . . . means lack of novelty [and therefore lack of patentability, *see* 35 U.S.C. § 102], and is a question of fact. To anticipate, every element and limitation of the claimed invention must be found in a single prior art reference, arranged as in the claim." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001). As with all fact questions, anticipation may be resolved at summary judgment if the evidence shows no genuine dispute of material fact requiring a trial to resolve. *Id.* at 1353 (affirming summary judgment that patent claim was anticipated). "[T]he evidentiary burden to show facts supporting a conclusion of invalidity is clear and convincing evidence." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002).

The "single prior art reference" to which Wyers points, *see Brown*, 265 F.3d at 1351, is a June 5, 2002 patent application by Newell Ryan Moss *et al.*, U.S. Patent Application Pub. No. 2003/0052472 A1, to which the parties refer as "Moss 472." Moss 472 disclosed a vertically adjustable hitch assembly similar to that disclosed in the 412 Patent, save that Moss's stepped gradations are a series of holes drilled through the middle of the vertical segment of the drop bar:



Moss 472, fig. 1.

Andersen does not dispute that item 11 in this illustration, which Moss 472 calls the "trunnion," *see id.* ¶ 57, equates to what the 412 Patent, claim 21, calls the "first component of the stepped drop bar." Both represent the horizontal segment that the user inserts into the towing vehicle's hitch adapter.

In this light, Wyers emphasized the following language from Moss: "In certain embodiments of the present invention, the apparatus **10** and the components thereof are made of steel, however, *aluminum*, ferrous alloys, or any other material possessing sufficient strength and durability may be used." Moss 472 ¶ 57 (emphasis added). Moreover, Moss states that the trunnion "may have any suitable cross section," *id.* ¶ 56, which Wyers takes to encompass claim 22's addition of a "standard two inch square end," particularly given that claim 22 explicitly names a "two inch square end" as the "standard" cross section, necessarily meaning it is a "suitable cross section" in the language of Moss. All of this together, says Wyers, establishes that Moss 472 fully anticipated the 412 Patent's claims 21 and 22. (ECF No. 96 at 13–15.)

Andersen offers three counterarguments. The Court will address each in turn.

1.    "Solid Aluminum"

Andersen first argues that Moss 472 "does not state, or even suggests, that the **end** of the trailer hitch component inserted into a hitch adapter on a vehicle could be made of **solid aluminum**." (ECF No. 101 at 18 (emphasis in original); *see also id.* at 20 (repeating this argument).) To the contrary, Moss 472 at least "suggests" a solid aluminum end of the trunnion. One of Moss 472's claimed innovations was the ability to mount the ball adapter component backwards and therefore within the profile of the vehicle when not in use. *See* Moss 472 ¶¶ 7–11. Moss 472 illustrates this through Figure 12:



Here, the end of the trunnion (item 11) is solid. Accordingly, Moss 472 discloses both aluminum and its solidity.

2.    Moss 472 vs. Moss 405

Andersen next emphasizes an earlier Moss application, U.S. Patent Pub. No. 2002/0113405 A1, to which the parties refer as "Moss 405." Moss 472 expressly incorporates Moss 405. *See* Moss 472 ¶ 17 (declaring "U.S. patent application Ser. No. 10/078,322," which became the Moss 405 publication, to be "incorporated herein by reference"). Moss 405 discloses essentially the same invention as in Figure 1 of Moss

472, reproduced above. However, Moss 405 also discloses a different potential embodiment, designed not to be a trailer hitch, but a mount for something like a flagpole:



FIG. 15

Moss 405 names item 98—comprising the tube (100) and its adjoining bracket (102)—the "standard," which then attaches to the horizontal segment (34) that, as in Moss 472, is named the "trunnion." *Id.* ¶ 69.

Of Figure 15, Moss 405 states the following, which appears to counsel that aluminum is only proper for light loads:

> Aluminum may serve well for the standard **98**. Similarly, the trunnion **12** [*sic*: 34] may be fabricated of aluminum for ease in fabrication. Since the standard **98** need not sustain the same loads as may a hitch **10**, lighter materials such as aluminum, or metals of lighter gauges may serve as the standard **98** and trunnion **34**.

*Id.* ¶ 70. In this light, Andersen argues that Moss 472, through its incorporation of Moss 405, "explicitly teaches that aluminum is unsuitable for hitches." (ECF No. 101 at 19.)

In patent jargon, Andersen's argument is that Moss 472/405 "teaches away" from the 412 Patent, claim 21.

> Whether the prior art teaches away from the claimed invention is a question of fact. A reference may be said to

> teach away when a person of ordinary skill, upon reading the
> reference, would be discouraged from following the path set
> out in the reference, or would be led in a direction divergent
> from the path that was taken by the applicant.

*Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015) (internal quotation

marks and citation omitted).

Andersen is incorrect to argue that Moss 472/405 "explicitly" teaches away from

making aluminum hitches.  But the relevant paragraph from Moss 405 makes little

sense unless one assumes that, at the time Moss filed Moss 405, he believed aluminum

could not "sustain the same loads" that a hitch may be required to sustain.  Moss 405

¶ 70.  Moss 405 thus *implies* that aluminum is not suitable for hitches.

Wyers urges the Court to adopt the contrary reasoning of the patent reexaminer,

who rejected Andersen's Moss 405 argument because it "cannot be interpreted as

teaching that a hitch could not be made of aluminum."  (ECF No. 96-17 at 43.)  But the

standard applicable in this lawsuit is not whether the prior art explicitly said that the later

invention "could not" succeed, but whether "a person of ordinary skill, upon reading the

reference, would be discouraged from following the path set out in the reference, or

would be led in a direction divergent from the path that was taken by the applicant."

*Allergan*, 796 F.3d at 1305.

Applying that standard, the Court ultimately agrees with the patent reexaminer's

alternative basis for rejecting Moss 405: "[Andersen] has not explained how or why

[paragraph 70 of Moss 405] would nullify or take precedence over the clear teaching in

paragraph 0057 of Moss 472 that the hitch apparatus 10 and its components may be

made of aluminum."  (ECF No. 96-17 at 49.)  Stated somewhat differently, Moss 472,

paragraph 57, unmistakably identifies "aluminum" (among other materials) as a material

from which one might fabricate the "apparatus," referring to the entire adjustable hitch mechanism "and the components thereof," as long as the aluminum (or other chosen material) "possess[es] sufficient strength and durability."  No jury could reasonably find that a person of ordinary skill who read Moss 472 and decided to go back and also read Moss 405 would have been "discouraged from following the path set out in" Moss 472, or would have been "led in a direction divergent from" Moss 472.  *See Allergan*, 796 F.3d at 1305.  At most, a reasonable jury could find that a person of ordinary skill would notice that Moss 472 seems to contradict Moss 405, and would be prompted by the apparent contradiction to *investigate* aluminum as a potential material for trailer hitches.

In sum, the interaction of Moss 472 and Moss 405 does not show that Moss 472 teaches away from using aluminum in hitch components.

### 3. Enablement

"To anticipate, the reference must also enable one of skill in the art to make and use the claimed invention."  *Transclean*, 290 F.3d at 1370.  Moreover, "the prior art reference must teach one of ordinary skill in the art to make or carry out the claimed invention *without undue experimentation*."  *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1306 (Fed. Cir. 2002) (emphasis added).  "Whether undue experimentation would have been required to make and use an invention, and thus whether a disclosure is enabling . . . is a question of law . . . ."  *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1369 (Fed. Cir. 1999).

Failure of enablement is a difficult argument to sustain.  "[W]hen an accused infringer asserts that a prior art patent anticipates specific patent claims, the infringer enjoys a presumption that the anticipating disclosure also enables the claimed invention."  *Impax Labs., Inc. v. Aventis Pharm., Inc.*, 545 F.3d 1312, 1316 (Fed. Cir.

14

2008).  The patentee must come forward with "persuasive evidence showing that the prior art patent does not enable the claimed invention."  *Id.*

In attempting to meet this standard, Andersen cites the declaration of its president, Ryan Andersen.  (ECF No. 101-1.)  Ryan Andersen in turn reports—without explaining the basis of his knowledge—the activities of John Andersen, the 412 Patent's named inventor, whose relationship to Ryan Andersen and Andersen Manufacturing, Inc., is not disclosed.  (*Id.* ¶¶ 16–19.)  Ryan Andersen says that John Andersen needed to identify an appropriate aluminum alloy and an appropriate shape for the hitch, and that he spent time testing his designs and even employing an outside laboratory.  (*Id.*)  Ryan Andersen provides no details regarding these assertions.

Even overlooking the evidentiary foundation problems, Ryan Andersen's declaration does not, as a matter of law, rise to "persuasive evidence showing that the prior art patent does not enable the claimed invention."  *Impax Labs.*, 545 F.3d at 1316.  As to aluminum alloys, the 412 Patent itself does not specify any particular alloy as part of the claimed invention.  It merely mentions (in the specification) "high-strength aluminum alloys, such as 6061-T6, 7075-T6, 7079-T6, 7178-T6, and the like" as "[e]xamples of materials used in accordance with the present invention."  412 Patent at 4:5–7.  As to experimentation and testing, Wyers served discovery requests seeking information and documents regarding Andersen's alleged experiments to develop a workable aluminum hitch (*see* ECF No. 102-2 at 7–8) but Andersen produced nothing (*see* ECF No. 102 at 11).[3]

---

[3] This assertion was made for the first time in Wyers's reply brief, but it responds directly to the failure-of-enablement argument in Andersen's response brief.  In any event, of the many matters on which Andersen sought leave to surreply (*see* ECF No. 103), this assertion was not one of them.

Consequently, Andersen has not carried its burden to demonstrate failure of enablement.

\* \* \*

For all these reasons, Wyers has established by clear and convincing evidence that a reasonable jury could only find the 412 Patent, claims 21 and 22,[4] anticipated by Moss 472.  Summary judgment of invalidity is therefore appropriate.[5]

## B.    The 510 Patent

The 510 Patent contains seven independent method claims, specifically, claims 1, 5, 9, 13, and 15–17.  The first step in each of these claims is some variation on "extruding aluminum through a die to form a profile in a shape of a drop bar."  Before the transfer to Colorado, Judge Winmill held a claim construction hearing and construed "drop bar" to mean "[a] hitch component that connects a hitch adapter to a trailer where the hitch adapter and the part of the trailer that receives the hitch are at different heights."  (ECF No. 65 at 12.)

There is no dispute that Wyers manufactures the Razor hitch through a process that includes extruding aluminum through a die.  Wyers argues, however, that Andersen cannot prove extrusion into a profile in a shape of a drop bar because Wyers does not, in fact, extrude aluminum with a profile in a shape of a drop bar.  Rather, Wyers extrudes aluminum in the shape of a somewhat flat brick which, on its thinnest edge, has the profile of a dumbbell.  This brick is later machined into two drop bars.  The

---

[4] Andersen offers no counterargument to Wyers's assertion that the "standard" 2-inch square shape disclosed in claim 22 is anticipated by Moss 472's requirement of a trunnion with "any suitable cross section," Moss 472 ¶ 56.  (*See* ECF No. 96 at 14–15.)

[5] In this light, the Court need not address Wyers's alternate argument that the 412 Patent is also invalid as obvious.  (*See* ECF No. 96 at 15–17.)

following photographs illustrate as much. The leftmost and middle photographs show

the aluminum extrusion from two different perspectives, and the rightmost photograph is

a comparison of the aluminum brick as extruded and then as later machined into two

Razor drop bars:

  

(Excerpt from ECF No. 96-25 at 2.)       (Excerpt from ECF No. 96-25 at 3.)       (Excerpt from ECF No. 101-11 at 62.)

As the photographs plainly show, when Wyers extrudes aluminum, the resulting

product is not in a shape of a "drop bar"—or, as Judge Winmill construed that term, "[a]

hitch component that connects a hitch adapter to a trailer where the hitch adapter and

the part of the trailer that receives the hitch are at different heights." (ECF No. 65

at 12.) Through a two-step argument, however, Andersen insists that the pre-machined

17

brick *is* in a shape of a drop bar.  (ECF No. 101 at 35, 39–40.)  As will become clear, the argument cannot succeed.

The first component of Andersen's argument is to characterize Wyers as "appear[ing] to be arguing that this limitation requires a profile from one specific side of a drop bar."  (*Id.* at 39.)  Construing the claim language this way, says Andersen, was "expressly rejected" by Judge Winmill in his claim construction order.  (*Id.*)

Andersen misconstrues Judge Winmill's order.  Judge Winmill never rejected, expressly or implicitly, any argument that "a profile in a shape of a drop bar" means the profile as viewed from a particular perspective.  Rather, he rejected Wyers's argument that "a profile in a shape of a drop bar" should be construed as "a removable mounting rod having a first level segment sized for insertion into a receiver hitch, a sloping transition segment, and a tow end that is level and lower than the first level segment." (ECF No. 65 at 7.)  In other words, Wyers wanted Judge Winmill to construe the relevant language to cover only the vaguely S-shaped drop bar illustrated in figure 4 of the 510 Patent (*see* Part II.B, above), to the exclusion of the upside-down-L shape of Wyers's Razor hitch.  Judge Winmill correctly rejected this argument because the 510 Patent encompasses "stepped" drop bars also.  (*See* ECF No. 65 at 9 (". . . Wyers' proposed construction runs headlong into the Federal Circuit's rule that forbids a court from tailoring a claim construction to either cover or exclude the dimensions of the accused product or process.").)

But Judge Winmill nowhere ruled that "profile in a shape of a drop bar" means *any* profile one might choose.  Rather, he ruled that "the terms 'profile' and 'shape' are common terms that need no elaboration."  (*Id.* at 10.)  And this ruling cannot be

divorced from the fact that he *did* construe "drop bar," so the relevant limitation can be read as follows: "extruding aluminum through a die to form a profile in a shape of a hitch component that connects a hitch adapter to a trailer where the hitch adapter and the part of the trailer that receives the hitch are at different heights." If "profile" and "shape" need no elaboration, then the extrusion naturally must have a profile recognizably that of a "drop bar," as construed.

Regardless, Andersen's argument also fails at its second component, which it draws from the opinion of its expert, Mr. Meeks. He reproduces the following two photos:

 

(ECF No. 101-2 at 13.) The photo on the left shows the as-machined Razor drop bar, looked at from the bottom up, and the photo on the right shows an alternate perspective of the pre-machined brick. Examining these photos, Mr. Meeks opines as follows: "As shown above the extrusion has the same profile on its sides as the drop bars. Specifically the profile on the edge of each side of the extrusion is rounded and has contoured edges." (*Id.* ¶ 45.)

Putting aside the fact that this opinion disregards the need for something with a

profile that is recognizably a "drop bar" as construed by Judge Winmill,[6] there is an

independent and equally fatal problem. Specifically, it rests on looking at *one-half of the*

*profile* of the pre-machined extrusion. In other words, the pre-machined extrusion,

looked at on its narrowest edge, has the profile of a dumbbell and can be made to look

like some profile of a Razor drop bar *only* by covering up one side of the photograph.

There can be no genuine dispute that when one must alter the profile of the extrusion to

make it look like a drop bar, it is not "a profile in a shape of a drop bar." Thus, Wyers

does not literally infringe any claim of the 510 Patent.

Wyers acknowledges that a patentee need not always prove literal infringement,

but can also prove infringement to the doctrine of equivalents. (ECF No. 96 at 22.)

"The doctrine of equivalents allows the patentee to claim those insubstantial alterations

that were not captured in drafting the original patent claim but which could be created

through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535

U.S. 722, 733 (2002). But "all claim limitations are not entitled to an equal scope of

equivalents. . . . [M]any limitations warrant little, if any, range of equivalents." *Moore*

*U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000). Wyers

thus argues that there can be "no equivalent shape to that of a drop bar" than that of a

drop bar. (ECF No. 96 at 22.)

Andersen does not respond to this argument. Indeed, its only mention of the

doctrine of equivalents is a generic citation for the proposition that both literal

infringement and infringement by the doctrine of equivalents are usually fact questions.

---

[6] Mr. Meeks assumes that whatever happens to match the profile of the Razor drop bar, *viewed from any angle*, is necessarily "a profile in the shape of a drop bar" because the Razor is a drop bar—a circular assertion that surely exceeds the bounds of what the 510 Patent actually claims.

(ECF No. 101 at 32–33.)  Andersen has therefore forfeited any argument that it may be able to sustain an infringement case under the doctrine of equivalents.  And the Court agrees with Wyers in any event.  The 510 Patent unmistakably requires the result of the extrusion step to have the profile in a shape of a drop bar.  To say that this is equivalent to extruding some other shape that, *through a later process*, is machined such that it bears the required profile, is far beyond equivalent.

Accordingly, Wyers is entitled to summary judgment that it does not infringe the 510 Patent.[7]

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Wyers's Motion for Summary Judgment (ECF No. 96) is GRANTED;

2.  Andersen's Motion for Leave to File Sur-Reply in Opposition to Motion for Summary Judgment (ECF No. 103) is DENIED AS MOOT;

3.  Andersen's Motion to Exclude Testimony of Dan Alan Beabout (ECF No. 112) is DENIED AS MOOT;

4.  The Final Trial Preparation Conference scheduled for April 5, 2019, and the 4-day jury trial scheduled to begin on April 22, 2019, are both VACATED; and

5.  The Clerk shall enter judgment in favor of Wyers and against Andersen, and shall terminate this case.  Wyers shall have its costs upon compliance with D.C.COLO.LCivR 54.1.

---

[7] Given this disposition, the Court need not address Wyers's arguments that the 510 Patent is invalid as obvious.  (*See* ECF No. 96 at 17–19.)

Dated this 7th day of February, 2019.

BY THE COURT:

_____

William J. Martinez
United States District Judge