**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 18-cv-0235-WJM-STV

ANDERSEN MANUFACTURING INC.,
an Idaho corporation,

      Plaintiff,

v.

WYERS PRODUCTS GROUP, INC.,
a Colorado corporation,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR ATTORNEYS' FEES**

---

Plaintiff Andersen Manufacturing, Inc. ("Andersen"), brought this suit against Defendant Wyers Products Group, Inc. ("Wyers"), for patent infringement. The inventions at issue are an adjustable-height trailer hitch made from aluminum, as described in U.S. Patent No. 7,156,412 ("412 Patent"); and a process for manufacturing that hitch, as described in U.S. Patent No. 7,222,510 ("510 Patent"). At summary judgment, the Court found that (i) the 412 Patent was invalid as anticipated and (ii) Wyers did not infringe the 510 Patent ("Summary Judgment Order"). *Andersen Mfg. Inc. v. Wyers Prod. Grp., Inc.*, 2019 WL 479777 (D. Colo. Feb. 7, 2019) (ECF No. 114). The Court entered final judgment in Wyers's favor on February 7, 2019. (ECF No. 115.)

Currently before the Court is Wyers's Motion to Declare this Case Exceptional and for Award of Attorney Fees and Costs. (ECF No. 118.) For the reasons explained below, the Court grants this motion in part and denies it in part, awarding Wyers

$131,542.07 in attorneys' fees.

## I. LEGAL STANDARD

"The court in exceptional cases may award reasonable attorney fees to the prevailing party [in a patent case]." 35 U.S.C. § 285. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). The question of whether a case is exceptional is evaluated "case-by-case . . . considering the totality of the circumstances," and is within the trial court's discretion. *Id.* Moreover, the two types of "exceptionality"—*i.e.*, "the substantive strength [or weakness, rather] of a party's litigating position" and "the unreasonable manner in which the case was litigated," *id.*—are "ultimately consider[ed] . . . together under the 'totality of the circumstances,'" *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1347 (Fed. Cir. 2015). The burden of proof is preponderance of the evidence. *Octane Fitness*, 572 U.S. at 557.

## II. BACKGROUND

### A. The Patents and Related Prior Art

#### 1. The 412 Patent

The U.S. Patent & Trademark Office ("PTO") issued the 412 Patent to Andersen on January 2, 2007. *See* 412 Patent, cover sheet. The field of the invention is towing hitches, such as for towing a boat or RV behind a truck. *Id.* at 1:14–62. As relevant here, the patent discloses a "stepped" (adjustable) hitch assembly, which permits the user to attach trailers of varying heights while keeping the trailer level. In the following illustrations from the patent, Figure 5 depicts the "drop bar" component whose upper

(horizontal) segment slides into the towing vehicle's hitch adapter, and whose other (vertical) segment is a series of graded steps over which the "sleeve" in Figure 6 can slide, locking into various heights.  The hollow column disclosed in Figure 6 secures the ball mount—the item that actually makes contact with the trailer—illustrated in Figure 7.



Fig. 5

Fig. 6

Fig. 7

As will become clear below, the 412 Patent was not the first to propose this basic design.  The patentable innovation asserted in the 412 Patent is that the components are made of aluminum, rather than steel.  *Id.* at 1:42–2:4.

2.    The 510 Patent

The PTO issued the 510 Patent to Andersen on May 29, 2007, from an application that traces back to the same application from which the 412 Patent arose. *See* 510 Patent, cover sheet.  The 412 and 510 Patents share the same specification, but in terms of the claimed invention, the 510 Patent emphasizes the method for creating aluminum drop bars, as compared to the 412 Patent's emphasis on the hardware itself.

3

The illustrations relevant to the 510 Patent focus on a *non*-adjustable drop bar, *i.e.*, one that emerges horizontally from the vehicle's hitch adapter, then slopes downward, then bends again into a lower horizontal component, to which the ball adapter is attached, as in the following:



Fig. 4

With this end product in mind, the patent illustrates how aluminum may be extruded through a die to form a thick metal sheet with the appropriate drop bar profile (Figure 1), after which the sheet can be sliced into multiple proto-drop bars that are machined into their final form (Figure 2):



Fig. 1        Fig. 2

Although these illustrations only show the vaguely S-shaped, non-adjustable drop bar, the 510 Patent does not limit itself to manufacturing that shape. It also applies to extrusion of aluminum drop bars in the upside-down-L shape of the drop bar emphasized in the 412 Patent. *See* 510 Patent, fig. 5; *id.* at 6:12–17.

3.    Moss 472 & Moss 405

In this case, whether the patents-in-suit describe anything novel—particularly the 412 Patent—has mostly revolved around the significance of two prior art references. The first is a June 5, 2002 patent application by Newell Ryan Moss *et al.*, U.S. Patent Application Pub. No. 2003/0052472 A1, to which the parties refer as "Moss 472." Moss 472 disclosed a vertically adjustable hitch assembly similar to that disclosed in the 412 Patent, save that Moss's stepped gradations are a series of holes drilled through the middle of the vertical segment of the drop bar:



Moss 472, fig. 1.  Moss 472 states that, "[i]n certain embodiments of the present invention, the apparatus **10** and the components thereof are made of steel, however, *aluminum*, ferrous alloys, or any other material possessing sufficient strength and durability may be used."  Moss 472 ¶ 57 (emphasis added).

But before Moss filed the document known as Moss 472, he filed U.S. Patent Pub. No. 2002/0113405 A1, to which the parties refer as "Moss 405."  Moss 472 expressly incorporates Moss 405.  *See* Moss 472 ¶ 17 (declaring "U.S. patent application Ser. No. 10/078,322," which became the Moss 405 publication, to be "incorporated herein by reference").  Moss 405 discloses essentially the same invention as in Figure 1 of Moss 472, reproduced above, but Moss 405 also discloses a different potential embodiment, designed not to be a trailer hitch, but a mount for something like a flagpole:



FIG. 15

Moss 405 names item 98—comprising the tube (100) and its adjoining bracket (102)— the "standard," which then attaches to the horizontal segment (34) that is meant to be inserted into a hitch adapter. *Id.* ¶ 69.

Regarding Figure 15, Moss 405 states the following:

> Aluminum may serve well for the standard **98**. Similarly, the trunnion **12** [*sic*: 34] may be fabricated of aluminum for ease in fabrication. Since the standard **98** need not sustain the same loads as may a hitch **10**, lighter materials such as aluminum, or metals of lighter gauges may serve as the standard **98** and trunnion **34**.

*Id.* ¶ 70. This suggests that, when Moss filed the document that became Moss 405, he viewed aluminum as unsuitable for trailer hitches. The incorporation by reference of Moss 405 into Moss 472 thus creates a tension with Moss 472's endorsement of aluminum for trailer hitches.

## B.  Diversi-Tech Lawsuit

Andersen owns a third patent related to trailer hitches, U.S. Patent No. 6,908,099 ("099 Patent"), issued on June 21, 2005. It discloses minor variations on the method of manufacturing a drop bar that would eventually become the 510 Patent.[1]

---

[1] The 099 Patent was originally part of the instant lawsuit (*see* ECF No. 1 at 4–5), but the PTO, through reexamination proceedings that ended in 2018, canceled all of its claims (*see*

In November 2005, Andersen sued a company named Diversi-Tech for infringement of the 099 Patent ("Diversi-Tech Lawsuit"). *See Andersen Mfg., Inc. v. Diversi-Tech Corp.*, Case No. 2:05-cv-9923 (D. Utah, Nov. 4, 2005). Andersen moved for a preliminary injunction, and Diversi-Tech's response brief highlighted Moss 472 as teaching that aluminum could be used for a trailer hitch. (ECF No. 118-3 at 24–25.)[2] Without mentioning Moss 472, U.S. District Judge Dee Benson denied the preliminary injunction in July 2006, reasoning that there was prior art evidence of using aluminum for trailer hitches and for manufacturing them in the way claimed by the 099 Patent, so there was a strong question of invalidity and therefore Andersen had failed to show a likelihood of success on the merits. (ECF No. 96-8 at 60–63.)

In July 2007, Judge Benson denied a second preliminary injunction motion, this one based on the newly issued 412 Patent. (ECF No. 96-10.) He again found that there were substantial prior art references both to drop-bar-style trailer hitches and the use of aluminum "in the trailer hitch industry." (*Id.* at 3–4.) So, again, he held that there was a strong question of invalidity and therefore Andersen had failed to show a likelihood of success on the merits. (*Id.* at 4.)

The Federal Circuit affirmed Judge Benson's two denials. (ECF No. 28-3.) "Practically no activity" took place in the action after that, and Judge Benson dismissed it with prejudice for lack of prosecution on October 5, 2009. (ECF No. 96-12 at 2–3.)

---

ECF No. 96 at 2 n.2; ECF No. 101 at 8 n.1).

[2] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits with unnumbered cover pages.

## C.    Wyers's Hitch

Since 2012, Wyers has offered for sale its "Razor" adjustable hitch, which is made of aluminum and is remarkably similar to the device disclosed in the 412 Patent:



(ECF No. 96-32 at 2.)  As this photograph shows, the only apparent differences between the Razor and the invention disclosed in the 412 Patent are that the graded steps face toward the towing vehicle, and the surface facing away from the towing vehicle is rounded.

## D.    Origins of this Lawsuit and Proceedings Before Transfer

This case began in January 2016 in the United States District Court for the District of Idaho, the Hon. B. Lynn Winmill presiding.  (ECF No. 1.)  In May 2016, Wyers filed with the PTO a request for *ex parte* reexamination of the 412 Patent.  (ECF No. 28-1 at 3; ECF No. 29-2 through 29-9.)  Shortly afterward, Wyers moved for a stay of the lawsuit pending the outcome of the reexamination.  (ECF No. 28-1.)  Andersen opposed, arguing that whether the PTO would grant Wyers's request remained

speculative, and, in any event, Wyers's request for *ex parte* reexamination (as opposed to *inter partes* review) would not definitively resolve anything because the results of *ex parte* proceedings may be re-litigated in court.  (ECF No. 34 at 2–3.)  Andersen further asserted that "reexaminations could take five years or more," and so a stay "would be highly prejudicial" due to the delay.  (*Id.* at 3; *see also id.* at 10 ("Although[] the Patent Office resolves 95% of *ex parte* reexaminations within 25 months, if there is an appeal to the Patent Trial and Appeals Board or the Federal Circuit, the reexamination can take much longer.").)

In September 2016—before a ruling from Judge Winmill—Wyers informed the Court that the PTO had granted the reexamination request.  (ECF Nos. 45-1, 45-3.)  Andersen responded that it still opposed to stay because "[r]esolution of the reexamination including any appeal could take five years or more."  (ECF No. 49 at 1–2.)

Judge Winmill denied the motion to stay in December 2016, reasoning that the stay would be unduly prejudicial to Andersen given the length of reexamination proceedings—"[m]ost of these reexaminations, including the inevitable appeal to the Patent Trial and Appeal Board, take three to five years to resolve"—and the parties' already-completed efforts in the lawsuit.  (ECF No. 55.)

In April 2017, Wyers again moved to stay, noting that the PTO had (in nonfinal actions) rejected all of the 412 Patent's claims, and Andersen had submitted claim amendments.  (ECF No. 63-1.)  Andersen filed its opposition in May 2017, pointing out Judge Winmill's prior reliance on the three-to-five-years estimate for reexamination proceedings, and arguing that nothing had changed to justify revisiting the denial of the

original motion to stay.  (ECF No. 64.)

Later in May 2017—before Judge Winmill ruled on the renewed motion to stay—Wyers filed a motion to transfer the lawsuit to the District of Colorado under the authority of the Supreme Court's then-recent decision, *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514 (2017).  (*See* ECF No. 67-1.)  Judge Winmill granted the motion to transfer in January 2018.  (ECF No. 78.)  The renewed motion to stay remained outstanding at that time.

## E.  Proceedings in this District

Shortly after transfer, U.S. Magistrate Judge Scott T. Varholak denied the renewed motion to stay without prejudice, essentially reasoning that it was outdated in light of the lapse of time since its filing and the subsequent transfer.  (ECF No. 90.)

Judge Varholak held a telephonic status conference on March 1, 2018.  Judge Varholak asked the parties for their positions on whether a new scheduling order was needed in light of the transfer.  Counsel for Andersen believed that a new scheduling order was appropriate, and asked for deadlines to be "push[ed] back" to give time for reexamination proceedings to conclude.[3]  In other words, Andersen was essentially seeking the sort of stay it had until then opposed.  Wyers, for its part, announced that it would soon file a summary judgment motion "essentially closing the case based on the invalidity of all the original claims [of the 412 Patent] . . . as well as noninfringement of the two method claims [of the 510 Patent]."  Wyers believed that any version of the patent emerging from reexamination would be so radically amended as to merit a new lawsuit.  Counsel for Andersen disagreed, characterizing the potentially amended

---

[3] No transcript of the status conference has been prepared.  The Court, however, has listened to the audio recording, which is available through the Court's internal servers.

claims as "very slightly amended."  Without weighing in on the parties' dispute, Judge Varholak decided to require the parties to prepare a new scheduling order, and he set a scheduling conference for April 11, 2018.  (ECF No. 95.)[4]

In the following days, counsel for Andersen attempted to dissuade counsel for Wyers from filing the threatened summary judgment motion.  (See ECF No. 130-1.) Counsel for Andersen asserted that it would be a waste of time to ask this Court to adjudicate anything regarding the 412 or 510 Patents in their original form because Andersen had, through yet-unfinished reexamination proceedings, elected to amend them.  (*Id.* at 2–3.)  Wyers filed its summary judgment motion anyway, on March 30, 2018.  (ECF No. 96.)

On April 20, 2018, Andersen filed its response in opposition to Wyers's summary judgment motion.  (ECF No. 101.)  In that response, Andersen represented as follows regarding the reexamination proceedings: "Although the patents-in-suit are currently in the process of being re-examined by the PTO, they, and all of their claims, continue to be valid and enforceable, and the ongoing re-examination proceedings have no relevance to this motion."  (ECF No. 101 at 8 n.1.)

Wyers replied in support of its summary judgment motion on May 4, 2018 (ECF No. 102), thus making that motion ripe.

The parties had their Final Pretrial Conference in October 2018 (ECF Nos. 109–10), and the Court soon after set a trial to begin on April 22, 2019 (ECF No. 111).

On February 7, 2019, the Court issued the Summary Judgment Order.  The

---

[4] A new scheduling order eventually entered (*see* ECF No. 100 at 12), but a further account of the parties' competing proposals and Judge Varholak's resolutions is not relevant to the motion currently under consideration.

Court held that the only claims of the 412 Patent still in dispute were invalid as anticipated by Moss 472. 2019 WL 479777, at *4–7 (ECF No. 114 at 8–16). As for the 510 Patent, the Court held that no reasonable jury could find that Wyers infringed. 2019 WL 479777, at *7–9 (ECF No. 114 at 16–21). The Court therefore entered final judgment in favor of Wyers and terminated the case. (ECF No. 115.)

On March 6, 2019, the PTO issued a "Notice of Intent to Issue Ex Parte Reexamination Certificate" regarding the 412 Patent. (ECF No. 121-5 at 4.) That notice stated that the reexamination certificate would not confirm any original claim as-is, but would allow certain original claims as amended, along with some entirely new claims. (*Id.* at 4–5.) The 412 Patent reexamination certificate in fact issued on April 22, 2019. (ECF No. 133-1.)

## III. ANALYSIS

The Court now turns to considering the various circumstances counseling for and against a finding that this case is "exceptional" under 35 U.S.C. § 285.

### A. Diversi-Tech & Moss 472

Wyers argues that the Diversi-Tech Lawsuit should have taught Andersen that a lawsuit based on any of its three patents was fatally infirm. (ECF No. 118 at 9.) Wyers further argues that at least Moss 472 was enough for Andersen to understand that making a hitch out of aluminum could not have been an innovative, patentable concept. (*Id.*) The Court disagrees that either the Diversi-Tech Lawsuit or Moss 472 (by itself) is a circumstance counseling in favor of declaring this case exceptional.

First, Moss 472 is specifically listed as prior art in the "References Cited" portion of the 412 Patent's cover page. Although it turns out that the PTO should not have issued the 412 Patent in light of Moss 472, the fact remains that it *did* issue the 412

13

Patent *despite* Moss 472.  Moreover, the Court has seen no evidence that Andersen misled the PTO in any way.  It would be rare circumstances when a party that has fully disclosed potentially invalidating prior art to the PTO and received a patent can nonetheless have some sort of duty to walk away from its newly-issued patent.  *See, e.g.*, *Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1180 (Fed. Cir. 2018) ("Having been issued a valid patent [after disclosure of allegedly invalidating prior art to the PTO], Stone was entitled to a presumption of good faith in asserting its patent rights against Cook in the form of a suit for infringement.").

Second, Wyers has not pointed this Court to anywhere in the record where it has made the precise arguments that convinced Judge Benson to deny the two motions for a preliminary injunction.  So, although the Diversi-Tech Lawsuit resulted in preliminary unfavorable rulings regarding the validity of Andersen's patents, it is not clear that those rulings put Andersen on notice of the arguments that would eventually succeed here.  And, in any event, Judge Benson's rulings were necessarily preliminary.

In sum, Moss 472, standing alone, and the outcome of the Diversi-Tech Lawsuit, are not factors counseling in favor of (or against) an exceptionality finding.

## B.    Circumstances Counseling in Favor of Exceptionality

Despite the disagreements just noted, the Court agreed with Wyers that the following counsel in favor of declaring this case exceptional.

### 1.    "A Profile in a Shape of a Drop Bar"

Every relevant claim of the 510 Patent requires some variation on "extruding aluminum through a die to form a profile in a shape of a drop bar."  As discussed and illustrated in Part II.A.2, above, the 510 Patent clearly discloses an aluminum extrusion of a certain profile that can be sliced into narrower individual pieces of the same profile,

which are then further drilled and smoothed into the final product.

        a.     *Andersen's Infringement Theory*

As explained in more detail in the Summary Judgment Order, *see* 2019 WL 479777, at *7–9 (ECF No. 114 at 16–21), Wyers does not manufacture its "Razor" hitch by extruding aluminum in a profile in a shape of a drop bar. It instead extrudes an aluminum brick with slightly projected, rounded edges, so as to resemble a dumbbell on one profile, which it then machines into two Razor drop bars:

  

(Excerpt from ECF No. 96-25 at 2.)    (Excerpt from ECF No. 96-25 at 3.)    (Excerpt from ECF No. 101-11 at 62.)

In March 2016, soon after this lawsuit began, Wyers disclosed at least the

rightmost photograph to Andersen to show that the Razor manufacturing process did not infringe the 510 Patent. (*See* ECF No. 118-7 at 2.) Andersen responded, however, that "the photograph you sent plainly shows that Wyers manufactures its drop hitch by extruding billet aluminum through a die to form a profile in the shape of an extruded drop bar." (*Id.*) To illustrate, Andersen added text and arrows to Wyers's photograph, pointing out the rounded edges:



(*Id.*) In other words, Andersen took the position that the decorative rounded edges are, without more, a drop bar profile.

Through the claim construction process, the parties stipulated that "drop bar" meant "a hitch component that connects a hitch adapter to a trailer where the hitch adapter and the part of the trailer that receives the hitch are at different heights." (ECF No. 40 at 3.) Thus, "profile in a shape of a drop bar" necessarily meant "profile in the shape of a hitch component that connects a hitch adapter to a trailer where the hitch adapter and the part of the trailer that receives the hitch are at different heights." Yet Andersen persisted through summary judgment with the argument that Wyers's pre-machined dumbbell-shaped brick has a profile in a shape of a drop bar. (*See* ECF No. 101 at 32–40.) Andersen asserted as much through argument of counsel, as if the comparison was obvious, and also presented the opinion of an expert that Wyers's pre-machined brick has a profile in a shape of a drop bar because Wyers's *post*-machined

Razor is (by definition) a drop bar and it looks like *one half* of the pre-machined brick when viewed from the edge-on perspective, so the pre-machined brick must have the profile of a drop bar. (*Id.* at 37–38.)

To state the argument is to reveal its absurdity. The Court held as much in the Summary Judgment Order, and further noted that Andersen did not attempt an argument under the doctrine of equivalents. *See* 2019 WL 479777, at *8–9 (ECF No. 114 at 19–21). Thus, Andersen's position on this matter was objectively weak, and Andersen knew as much from early in the case.

### b. *Exaggeration of Judge Winmill's Claim Construction Order*

Yet there is one more aspect of this "profile in a shape of a drop bar" dispute that bears mentioning in the context of whether this case should be declared exceptional. Through claim construction briefing, Wyers argued that this limitation should be construed as "a removable mounting rod having a first level segment sized for insertion into a receiver hitch, a sloping transition segment, and a tow end that is level and lower than the first level segment." (ECF No. 40-1 at 4.) This construction would have effectively limited the 510 Patent to the vaguely S-shaped form shown in the patent's illustrations (*see* Part II.A.2, above), to the exclusion of the upside-down-L shape of Wyers's Razor hitch.

At the claim construction hearing, Judge Winmill rightly expressed skepticism regarding Wyers's proposed construction, given that Wyers was attempting to limit the 510 Patent's claims to a single illustrated embodiment. (*See* ECF No. 60 at 20–21.) But Judge Winmill also pressed counsel for Andersen on how the dumbbell-shaped brick (which he referred to as "more like an I-beam than . . . like a drop bar") could meet the "profile in a shape of a drop bar" limitation. (*Id.* at 50–51.) Counsel for Andersen—

who had consistently argued that the term needed no construction because its plain meaning could be easily understood by a jury—emphasized that it was a question for infringement, not claim construction.  (*Id.* at 51.)  Judge Winmill responded,

> So if we get to trial, [and] I have defined the terms "profile in the shape of a drop bar" the way that you're requesting [*i.e.*, leaving it to its plain meaning], will the defendants [*sic*] be free to argue that the image here [referring to the same side-by-side photograph reproduced above] that what they are doing—if they were doing exactly what you have portrayed here, that there is nothing about the profile of this item on the right  that makes it in the shape of a drop bar and, therefore, it is not infringing?

(*Id.* at 51–52.)  Andersen's counsel responded, "Correct.  They are free to argue that." (*Id.* at 52.)

In his claim construction order, Judge Winmill relied on this exchange to rule that "profile in a shape of a drop bar" needs no construction.  (ECF No. 65 at 7–10.)  Judge Winmill further emphasized that Wyers's argument would contradict cases such as *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006), which holds that a court may not tailor a claim construction either to cover or exclude the dimensions of the accused product or process.  (*Id.* at 9.)  Nonetheless, Wyers remained "free to make [an] argument" on the merits "that its extruded brick or I-beam was not 'a profile in a shape of a drop bar.'"  (*Id.* at 10.)

Wyers, in its summary judgment brief, did just that, asserting that its "extrusions . . . are in the shape of an I-beam," not a drop bar, and "[n]o reasonable jury could hold otherwise."  (ECF No. 96 at 21–22.)  Andersen responded by stretching Judge Winmill's claim construction order:

> In claim construction, Wyers previously argued that this limitation should be construed to require a side profile, and the District of Idaho expressly rejected that argument.

Wyers asserted that the phrase "profile in a shape of a [ ] drop bar" should be construed as requiring "a removable mounting rod having a first level segment sized for insertion into a receiver hitch, a sloping transition segment, and a tow end that is level and lower than the first level segment." The District of Idaho recognized that this would improperly require that the profile be a side profile of a particular embodiment of Andersen's patent.

(ECF No. 101 at 39 (citations omitted; alterations in original).) In truth, Judge Winmill never "expressly rejected" an argument based comparing one "side profile" to another. He only rejected a construction that would narrow the limitation to a single embodiment. Andersen's attempt to try and convince this Court otherwise illustrates both the weakness of its 510 Patent arguments and its unreasonable litigation tactics.

2.   Moss 472, Moss 405, and Enablement

In the context of the 412 Patent, Andersen engaged in additional unreasonable litigation tactics, further revealing argumentative weaknesses, when trying to avoid the significance of Moss 472 at the summary judgment phase.

a.   *An "End" Made of "Solid Aluminum"*

Moss 472 explicitly states that "aluminum . . . or any other material possessing sufficient strength and durability may be used" to make the trailer hitch disclosed in that application. Moss 472 ¶ 57. Andersen countered that Moss 472's reference to aluminum "does not state, or even suggest, that the **end** of the trailer hitch component inserted into a hitch adapter on a vehicle could be made of **solid aluminum**." (ECF No. 101 at 18 (emphasis in original); *see also id.* at 20 (repeating this argument).) This is both true and irrelevant. As explained in the Summary Judgment Order, Moss 472's illustrations disclose a solid end to the component inserted into the hitch adapter. 2019 WL 479777, at *5 (ECF No. 114 at 11). Moss 472 makes no qualification that the solid

end (or any other component) may *not* be made of aluminum.  Accordingly, Moss 472's failure to state specifically that "all components of the hitch may be made from aluminum" or "the solid end may be made from aluminum" is meaningless.

b.     *Exaggeration of Moss 405*

Again, Moss 405's significance as compared to Moss 472 is that it discloses a flagpole-holding embodiment using these words: "Since the standard [the tube and bracket into which the flagpole is inserted] need not sustain the same loads as may a [towing] hitch, lighter materials such as aluminum, or metals of lighter gauges may serve as the standard and trunnion."  Moss 405 ¶ 70 (illustration references removed).

At summary judgment, Andersen argued that "Moss '405 *explicitly* teaches that aluminum is unsuitable for hitches, but strong enough to support flagpoles."  (ECF No. 101 at 19 (emphasis added).)  The Court explained that that "Moss 405 makes little sense unless one assumes that, at the time Moss filed Moss 405, he believed aluminum could not 'sustain the same loads' that a hitch may be required to sustain.  Moss 405 thus *implies* that aluminum is not suitable for hitches."  2019 WL 479777, at *5 (ECF No. 114 at 13) (emphasis in original).  But Andersen was "incorrect to argue" that Moss 405 "'explicitly' teaches away from making aluminum hitches." *Id.*[5]

c.     *Vagueness and Evasiveness Concerning Enablement*

Another point of contention regarding Moss 472 was whether it would "enable

---

[5] In its reply brief in support of declaring this case exceptional, Wyers argues for the first time that Moss 405 allegedly teaching away from using aluminum in trailer hitches is irrelevant because the Federal Circuit held in *Celeritas Technologies, Ltd. v. Rockwell International Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998), that "[a] reference is no less anticipatory if, after disclosing the invention, the reference then disparages it.  Thus, the question whether a reference 'teaches away' from the invention is inapplicable to an anticipation analysis."  (ECF No. 131 at 5–6.)  Wyers did not raise this argument at summary judgment and the Court will not address it now.

one of skill in the art to make and use the claimed invention." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002). Moreover, "the prior art reference must teach one of ordinary skill in the art to make or carry out the claimed invention without undue experimentation." *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1306 (Fed. Cir. 2002).

In reexamination proceedings, Andersen faced resistance from the patent examiner in light of Moss 472. Andersen thus turned to the "without undue experimentation" requirement, offering a declaration from its president, Ryan Andersen. (ECF No. 118-12.) The declaration asserts, "Through significant Andersen innovations, some of which are mentioned below, it designed, developed, and eventually produced a significant advance in trailer hitch technology—the first aluminum trailer hitch for coupling a towing vehicle to a trailer." (*Id.* ¶ 8.) One of those "innovations . . . mentioned below" is, allegedly, the specific aluminum alloy, about which the declaration says the following:

> John Andersen, the inventor of the '412 patent [and apparently Ryan Andersen's father, *see* ECF No. 126 at 15], identified an aluminum alloy out of the dozens of alloys available that provided both strength and rust resistance.
>
> Mr. Andersen also identified a size and shape of the hitch that would be sufficiently strong—for example, a much thicker shape—than typically used in steel trailer hitches.
>
> Mr. Andersen also tested the hitch by towing heavy loads in order to ensure that the hitch would actually sustain towing loads.
>
> Mr. Andersen also used an outside laboratory to test the hitch under heavy loads.

(*Id.* ¶¶ 33–36.)

When Wyers became aware of this declaration, it served Andersen with

discovery requests for all documents backing up Ryan Andersen's claims about John Andersen's inventing activities. (ECF No. 102-2 at 7–11.) Andersen responded generically that it would "produce responsive, non-privileged documents and things to the extent they exist, are located after a reasonable search, and are in Andersen's possession, custody, and/or control." (ECF No. 102-3 at 14–22.)

Andersen never produced any documents (*see* ECF No. 102 at 11; *see also* ECF No. 118 at 5–6), but Andersen nonetheless argued against enablement at summary judgment through a revised version of the Ryan Andersen declaration that made the same claims about John Andersen's inventing activities (*see* ECF No. 101-1 ¶¶ 16–19).

The Court held that the Ryan Andersen declaration had obvious "evidentiary foundation problems"—*i.e.*, what was the basis of Ryan Andersen's knowledge about what John Andersen did?—but the Court assumed for argument's sake that those problems could be overcome. 2019 WL 479777, at *6–7 (ECF No. 114 at 15). The Court went on to find, in part because of Andersen's failure to produce supporting documents, that Andersen could not sustain its burden to show lack of enablement. *Id.* (ECF No. 114 at 15–16).

In the motion presently under consideration, Wyers recounts the foregoing as evidence of bad faith litigation tactics. (ECF No. 118 at 5–6, 13.) Andersen, in its response brief, provides the following rebuttal (by way of attorney argument only, not by way of declaration):

> John Andersen, the inventor of the asserted patents, has retired. His son, Ryan Andersen, now runs Andersen. Andersen submitted a declaration from Ryan Andersen detailing his father's experimentation. Wyers never subpoenaed John Andersen, the inventor, for documents or deposition testimony regarding the experimentation he

> conducted.  Accordingly, Wyers' conclusion that Andersen
> hid a lack of evidence is unfounded.

(ECF No. 126 at 15.)

This explanation is frankly disturbing.  The declaration submitted to the PTO and the declaration submitted to this Court both state that they would recount "significant Andersen innovations, some of which are mentioned below"—thus attributing the inventions to the company.  (ECF No. 101-1 ¶ 5; ECF No. 118-12 ¶ 8.)  At no time before Andersen filed its opposition to declaring this case exceptional did Andersen explain that John Andersen was (apparently) working entirely for himself when he invented the aluminum hitch, and that all relevant documents (if any really exist) are in his possession and so must be obtained by subpoena.

The fact that (i) John Andersen himself never submitted a declaration; (ii) Andersen (the company) only now provides this explanation of why it never produced relevant documents; and (iii) Andersen presents its explanation by way of attorney argument only, strongly suggests that Ryan Andersen fabricated the relevant assertions in his declarations (which, in the case of the summary judgment declaration, could render him in contempt of court for falsifying evidence) and that Andersen's counsel knows as much or is willing to turn a blind eye to the likelihood of falsification (either of which is sanctionable under Federal Rule of Civil Procedure 11(b)).

### 3.   Conveniently Shifting Positions

As explained more fully in the Court's order entered earlier today denying Andersen's motion for Rule 60(b)(6) relief (ECF No. 135), Andersen has engaged in convenient position-shifting in this lawsuit.

Wyers twice moved to stay the lawsuit pending reexamination proceedings and

Andersen twice opposed, claiming that reexamination proceedings could take up to five years.  (*See also* Part II.D, *above.*)  However, when moving for Rule 60(b)(6) relief, Andersen understood that it was asking the Court to put the case in the same place it would have been had Andersen agreed to a stay.  To explain itself, Andersen said that it thought the reexamination proceedings would proceed along a statistically median schedule of a little more than nineteen months, and only when "it became apparent that the reexaminations were progressing much more slowly than anticipated" did it decide that case deadlines should be extended (in effect, seeking a stay).  (ECF No. 119 at 4, 8.)  But Andersen's representations to Judge Winmill show that it knew from that outset that reexamination could be very lengthy, and that was supposedly a reason to *deny* a stay.

The Court does not fault Andersen for opposing the stay, nor for eventually seeking scheduling order deadlines that amounted to a stay.  Andersen's shifting *explanations*, however, evidence its willingness to say whatever is needed to obtain the outcome it seeks.

### 4.    Extreme Understatement of the Reissued 412 Patent

Andersen's counsel stated to Judge Varholak that the reissued version of the 412 Patent would be "very slightly amended."  The Court has reviewed the reexamination certificate.  (*See* ECF No. 133-1.)  Of the 412 Patent's twenty-two original claims, none survives unamended, and ten are simply canceled.  Thirty-seven new claims are added.  The claims of the 412 Patent, as stated in the reexamination certificate, span approximately 200 lines of text, yet the Court counts only 26 lines that retain any text from the original claims.  This tally includes the new claims, which naturally do not retain language from the original claims.  But even looking only at the original claims, as

amended, they span approximately 80 lines of text—and again, only 26 lines retain anything of the original.

Moreover, the focus of the reissued 412 Patent is not on aluminum (although that remains a limitation of certain claims) but on what the PTO has apparently accepted as unique elements of Andersen's design, particularly the grooves into which one may insert or remove a pin to lock in or adjust, respectively, the vertically adjustable component that ultimately connects to the trailer.

In short, the reissued 412 Patent cannot be reasonably—or accurately— described as "very slightly amended."

### 5.    Lack of Candor at Summary Judgment

As recounted above (Part II.E), Andersen had committed itself to the 412 Patent amendments before Wyers filed for summary judgment and, on that basis, tried to dissuade Wyers from filing a summary judgment motion.  Andersen even said that adjudicating anything on the merits regarding the original claims would be an "utter waste of resources."  (ECF No. 130-1 at 2.)  The implication is obvious—Andersen was giving up on the original claims.  Yet when Wyers filed for summary judgment, Andersen neither conceded the motion nor even informed the Court that it no longer had a genuine intent to enforce the original claims.  Andersen instead asserted that "all of [the original] claims[] continue to be valid and enforceable, and the ongoing re-examination proceedings have no relevance to [Wyers's] motion."  (ECF No. 101 at 8 n.1.) Andersen even offered a case for the proposition that "where co-pending actions are 'neither duplicative nor dependent on one another, there is neither any need nor any justification' for a stay."  (*Id.* (quoting *Slip Track Sys., Inc. v. Metal Lite, Inc.*, 159 F.3d 1337, 1341 (Fed. Cir. 1998)).)  While this may have been technically true, it was also

misleading in that the Court and the parties were required to continue litigating a dispute that no longer genuinely intended to litigate.

In light of Andersen's later request for Rule 60(b)(6) relief (*see* ECF Nos. 119, 135), it is plain that Andersen was stalling for time, hoping reexamination proceedings would finally conclude and moot the summary judgment motion, because Andersen sees an advantage to litigating the reissued claims in this action as opposed to filing a new action. But making filings for purposes of "unnecessary delay" is prohibited. Fed. R. Civ. P. 11(b)(1).

## C.    Circumstances Counseling Against Exceptionality

The Court finds that the following counsels against a finding of exceptionality.

First, regarding the 412 Patent, Andersen's basic argument against anticipation was not objectively meritless. The PTO issued the 412 Patent over Moss 472, and Moss 472 incorporated Moss 405 by reference—therefore incorporating Moss 405's skepticism about aluminum, even if contradictory to Moss 472's general endorsement of aluminum for trailer hitches.

Second, Andersen represents in its response brief—and Wyers's reply brief nowhere disagrees—that counsel for both sides "displayed an unusually high level of cooperation in avoiding the types of disputes frequently seen in patent litigation." (ECF No. 126 at 3.)

## D.    Synthesis

The Court has found a number of objectively weak arguments (especially as to the 510 Patent), one instance of probably falsified evidence, a pattern of exaggerating matters of record, and a lack of candor to the Court. Balanced against this is the merit of Andersen's original argument under the 412 Patent and counsel's high level of

cooperation.

Considering all this together, the Court finds by a preponderance of the evidence that this case "stands out from others with respect to the substantive [weakness] of [Andersen's] litigating position (considering both the governing law and the facts of the case) [and] the unreasonable manner in which the case was litigated." *Octane Fitness*, 572 U.S. at 554. The Court, accordingly, finds that this is an "exceptional case," 35 U.S.C. § 285, and will award fees.

## E. Scope of Fees

The final question is the amount of fees to award. Wyers asks that the Court award it $170,928.06 in fees, $38,699.40 in costs that "should be awarded by the Court in declaring the case exceptional," and $362.50 in other costs (apparently referring to those claimed under Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. § 1920). (ECF No. 118 at 15.) Wyers cites no authority that costs of any kind are awardable under 35 U.S.C. § 285. Indeed, that statute says only that "[t]he court in exceptional cases may award reasonable *attorney fees* to the prevailing party" (emphasis added). Accordingly, the Court will not award any costs through this order. Wyers must claim its costs through the normal Bill of Costs procedure established in D.C.COLO.LCivR 54.1.[6]

Turning to the fees, the Court finds that Attorney Scott Swanson's and Attorney Rick Martin's rates of $200 per hour (and later, $225 per hour) are reasonable in light of their experience, and that their timenotes adequately document their work on this case. However, a significant portion of these timenotes describe work related to the patent

---

[6] The Court makes no ruling on whether any of Wyers's costs—those in the $38,699.40 category or those in the $362.50 category—are compensable under Rule 54(d)(1) and 28 U.S.C. § 1920. The Court only rules that Wyers must claim its costs through the usual procedures, and not as part of a motion for fees under 35 U.S.C. § 285.

reexamination proceedings before the PTO.  Andersen points out that "35 U.S.C. § 285 does not provide for an award of fees incurred in ancillary proceedings," although the Federal Circuit "has not yet considered this issue."  (ECF No. 126 at 7 n.2.)[7]  Wyers does not respond to this argument.  Considering the lack of case law on the matter, and given that the Court's summary judgment order was in no way influenced by the reexamination proceedings, the Court finds that it should not award fees related to PTO submissions or reviewing the progress of reexamination proceedings.  The Court has therefore excluded those amounts, totaling $39,385.99,[8] thereby reducing the fees to $131,542.07.  The Court finds this amount reasonable under the circumstances, particularly given the length of this litigation and the number of issues involved.

For these reasons, the Court will award attorneys' fees to Wyers in the amount of $131,542.07, under the authority of 35 U.S.C. § 285.

---

[7] Andersen raises no other objection to Wyers's counsel's timenotes, hourly rates, billing judgment, or any other matter that might influence the amount the Court chooses to award.

[8] Specifically, from Swanson's timenotes the Court has excluded June 6, 2016 ($60.00), June 9, 2016 ($200.00), June 10, 2016 ($360.00), June 13, 2016 ($200.00), August 12, 2016 ($50.00 (one half disallowed)), October 27, 2016 ($20.00 (one third disallowed)), November 7–22, 2016 ($2917.50), December 20, 2016 ($100.00), January 5, 2017 ($380.00), January 26, 2017 ($46.66 (one third disallowed)), January 27, 2017 ($80.00), March 1, 2017 ($60.00), March 20, 2017 ($80.00), June 13, 2017 ($300.00), February 6, 2018 ($315.00), and February 8, 2018 ($247.50).  From Martin's timenotes the Court has excluded April 29, 2016 ($7,000.00), June 8, 2016 ($14,000.00), November 8–21, 2016 ($1,866.00), December [date redacted], 2016 ($4,000.00), January 18–27, 2017 ($750.00), February 9, 2017 ($35.00), March 1–18, 2017 ($1,383.33), March 27, 2017 ($35.00), March 30, 2017 ($50.00), April 3, 2017 ($100.00), May 1, 2017 ($100.00), May 9, 2017 ($100.00), July 8, 2017 ($200.00), August 29, 2017 ($35.00), September 6, 2017 ($100.00), October 8–30, 2017 ($545.00), December 7, 2017–January 8, 2018 ($1,195.00), February 5, 2018 ($281.25), February 26, 2018 ($225.00), March 5, 2018 ($337.50), March 7, 2018 $112.50), July 13, 2018 ($168.75), January 12, 2019 ($337.50), January 13, 2019 ($112.50), January 18, 2019 ($450.00), and February 2, 2019 ($450.00).

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Wyers's Motion to Declare this Case Exceptional and for Award of Attorney Fees and Costs (ECF No. 118) is GRANTED IN PART and DENIED IN PART;

2. The Clerk shall enter an amended judgment requiring Andersen to pay to Wyers $131,542.07 in attorneys' fees; and

3. To the extent Wyers still intends to claim its costs, it must file a Bill of Costs (using the proper CM/ECF event code) within 14 days.

Dated this 23rd day of August, 2019.

BY THE COURT:

William J. Martinez
United States District Judge